UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

OTIS R. ELION,

        Petitioner,

   v.

UNITED STATES OF AMERICA,

        Respondent.

Case No. 3:17-cv-01349-JPG

## MEMORANDUM AND ORDER

This matter comes before the Court on remand from the Court of Appeals for the Seventh Circuit. (Doc. 58). Previously, the Court denied the motion to vacate or correct sentence pursuant to 28 U.S.C. § 2255, (Docs. 1, 37), filed by the Petitioner, Otis R. Elion.

Having conducted an evidentiary hearing, reviewed all briefs, testimony, and other relevant information; the Court finds that the representation provided by the Petitioner's attorney, Judith Kuenneke, did not fall below an objective standard of reasonableness. Therefore, while her failure to object prejudiced Elion, Kuenneke did not provide ineffective assistance of counsel. Accordingly, the Court hereby **DENIES** Elion's § 2255 petition. (Doc. 1).

## I.    INTRODUCTION

Otis R. Elion filed a § 2255 petition alleging that he was incorrectly sentenced as a career offender and that his attorney was ineffective for not objecting to his career offender status at sentencing. Previously, this Court found that Elion was correctly sentenced. As a result, the Court found that he was not prejudiced by Kuenneke's refusal to object, and, therefore, she had provided effective assistance. Accordingly, the Court denied his petition.

The Court of Appeals for the Seventh Circuit disagreed. Using the categorical approach,

1

the Appellate Court found that Elion's Illinois convictions could not be used for the career

offender calculation. Without those Illinois convictions, Elion only had one prior controlled

substance offense on his record—less than the two prior convictions required for career offender

status. Consequently, the Court of Appeals found that Elion was incorrectly sentenced as a career

offender, and, as a result, that he was prejudiced by Kuenneke's failure or refusal to object to

the enhancement at his sentencing. The Court of Appeals declined to address whether

Kuenneke's performance was deficient. The Appellate Court remanded this case on

that question.

There are both factual and legal disputes here. The factual disputes concern Kuenneke's

familiarity and use of the categorical approach, as well as her honesty and credibility. These

factual disputes must be resolved before the Court can analyze Kuenneke's performance.

As an understanding of the nuances of the categorical approach is required to evaluate the

facts of this case, for ease of understanding, the Court will begin by explaining the categorical

approach, then provide the background of this case, followed by the Court's factual analysis and

ultimate findings. Next, the Court will lay out the appropriate standard for evaluating ineffective

assistance of counsel claims—including *Bridges v. United States*, 991 F.3d 793, 793 (7th Cir.

2021)—before moving to the legal analysis and conclusion.

## II.   CAREER OFFENDER ENHANCEMENT & CATEGORICAL APPROACH

### A.  Career Offender Enhancement

The relevant portion of the U.S. Sentencing Guideline manual reads:

Career Offender

A defendant is a career offender if . . . the defendant has at least two prior felony
convictions of . . . a *controlled substance violation* . . . . A career offender's criminal
history category in every case under this subsection shall be Category VI.

U.S.S.G. § 4B1.1 (emphasis added) (hereinafter "career offender enhancement"). The Guidelines define a "controlled substance violation" as:

> An offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

U.S.S.G. § 4B1.2(b) (hereinafter "§ 4B1.2(b)" or "Guideline definition"). Therefore, any defendant with two or more prior convictions for a controlled substance violation is a career offender and subject to the higher Guideline range.

### B.  <u>Categorical and Modified Categorical Approaches</u>

Determining whether a prior conviction is a predicate for a sentence enhancement is a matter of statutory interpretation. Sentencing courts apply a "categorical approach" to determine whether a prior conviction is a "controlled substance offense" under the Guidelines. *See Taylor v. United States*, 495 U.S. 575, 600–01 (1990); *United States v. Montez*, 858 F.3d 1085, 1096 n.3 (7th Cir. 2017) (noting that *Mathis*—*Taylor*'s progeny—applies to career-offender cases).

The categorical approach requires that courts "compare the elements of the statute forming the basis of the defendant's conviction with the elements of the 'generic' crime . . . ." *Descamps v. United States*, 570 U.S. 254, 257 (2013); *see also Shepard v. United States*, 544 U.S. 13, 19–20 (2005) (holding that a conviction based on a guilty plea may also qualify as a predicate offense). If the statute's elements are the same as (or narrower than) those of the generic offense, then a conviction under that statute qualifies as a predicate offense. *Descamps v. United States*, 570 U.S. at 257. However, if the statute of conviction is broader than the generic offense, then the court must determine whether the statute of conviction is "divisible" or "indivisible." *Id.* at 261.

3

A statute is divisible if it "comprises multiple, alternative versions of the crime," *Id.* at 262, and lists alternative elements, not alternative means. *Mathis v. United States*, 579 U.S. 500, 504–05 (2016). "'Elements' are the 'constituent parts' of a crime's legal definition—the things the 'prosecution must prove to sustain a conviction.'" *Id.* at 504 (quoting *Elements*, Black's Law Dictionary (10th ed. 2014)). In contrast, "means" are the factual circumstances or events that "need neither be found by a jury nor admitted by a defendant." *Id.* (citing *Means*, Black's Law Dictionary (10th ed. 2014)).

If the court finds that the statute consists of "a single, indivisible set of elements," *Descamps* at 258, then the statute is "indivisible," and convictions under that statute fail to qualify as predicate offenses.[1] *Mathis v. United States*, 579 U.S. at 509. But, if the statute lists alternative elements, and "at least one, but not all of those crimes match the generic version," then the statute is "divisible," and convictions under that statute *may* qualify as a valid predicate.

If divisibility is not abundantly clear from a plain reading of the statute and there is no mandatory federal authority, a court turns to the state of conviction's case law to see whether state courts treat the statute as divisible. *Id.* at 517–18. This analysis begins with the relevant state's supreme court. If there is no indication from the state supreme court, a court next looks at intermediate state appellate courts.

If neither the text of the statute nor state case law offer a clear answer, then a court "peeks" at the record documents. *Id.* at 518-19 (citing *Rendon v. Holder*, 782 F.3d 466, 473-74 (CA9 2015) (opinion dissenting from denial of reh'g en banc). These record documents, the

---

[1] When a statute is indivisible, the offense is not de jure an invalid predicate. When a statute is indivisible, whether that conviction is a predicate for the enhancement depends on whether the statute of conviction matches or is narrower than the Guidelines. Theoretically, a statute can be indivisible and also narrower than the Guidelines. However, because the divisibility analysis is only performed when a court has already determined that the statute of conviction is broader than the Guidelines; for all intents and purposes, if a statute is deemed indivisible, a conviction under the indivisible statute is, de facto, an invalid predicate for the enhancement.

*Shepard* documents, include the indictment, jury instructions, and plea colloquy; but a court is not strictly limited to just those documents. *Shepard v. United States*, 544 U.S. at 26 (2016).

A court "peeks" at the *Shepard* documents to evaluate whether a state conceives of a statute as divisible or indivisible. The key indicator of divisibility is when the *Shepard* documents show that one discrete offense is listed, to the exclusion of any other offenses in the statute. If a state charges and convicts of only discrete offenses listed in the statute, then that suggests divisibility. On the other hand, if the state charges and convicts of a general violation of the statute, or lists more than one discrete offense, then the statute is indivisible.

If the *Shepard* documents do not offer a clear answer, then the statute's divisibility is ambiguous. When a statute's divisibility is ambiguous, the statute fails to satisfy "*Taylor*'s demand for certainty when determining whether a defendant was convicted of a generic offense." *Shepard*, 544 U.S. at 21 (internal quotations omitted). Accordingly, courts err on the side of indivisibility and treat ambiguous statutes as indivisible.

Importantly, while a "peek" at the documents is appropriate, courts do not look to the underlying facts. *James v. United States*, 550 U.S. 192, 214 (2007). *See also Sykes v. United States*, 564 U.S. 1, 7 (2011). Thus, courts must be cautious to avoid conflating factual descriptions of crimes laid out in the *Shepard* documents with elements of a discrete offense.

If a statute is divisible, then a sentencing court must determine whether the specific "discrete" offense fits within the Guideline definition. When evaluating whether a discrete offense is covered under the Guidelines, courts employ a "modified categorical approach." Under the modified categorical approach, a court examines the *Shepard* documents to find "which element played a part in the defendant's conviction." *Descamps*, 570 U.S. at 255. If the elements of the discrete offense lay out conduct that matches or is narrower than the Guidelines,

5

then the conviction is a valid predicate for the enhancement. However, if one or more of the

elements of the discrete offense is broader than the Guidelines, then the discrete offense is not a

valid predicate.

### C.  Illinois Statutes

Unlawful Delivery of a Look-Alike Substance Within 1,000 Feet of Public Housing

Property, 720 ILL. COMP. STAT. 570/407(b)(3) (1998), (hereinafter "Section 407(b)(3)"),

provides that:

> (b) Any person who violates:
> . . . .
>> (3) subsection (e) of Section 401 or Subsection (b) of Section 404 . . . within
>> 1,000 feet of . . . residential property owned, operated or managed by a
>> public housing agency . . . is guilty of a Class 2 felony, the fine of which
>> shall not exceed $200,000 . . . .

*Id.* Section 407(b)(3) is an enhancement statute for Section 401(e) or 404(b) violations that occur

within 1,000 feet of public housing. Section 401(e) is irrelevant here because Elion's prior

convictions were under Section 407(b)(3) (in 1999) and 404(b) (in 2000). Section 404(b),

Unlawful Delivery of a Look-Alike Substance, provides:

> (b) It is unlawful for any person knowingly to manufacture, distribute, advertise, or
> possess with intent to manufacture or distribute a look-alike substance. Any
> person who violates this subsection (b) shall be guilty of a Class 3 felony, the
> fine of which shall not exceed $150,000.

720 ILL. COMP. STAT. 570/404(b) (1999) (hereinafter "Section 404(b)"). Since Section 404(b) is

the underlying statute for Section 407(b)(3) (and 401(e) does not involve "look-alike"

substances), a conviction under Section 404(b) must be a "controlled substance offense" under

the Guidelines for either Illinois conviction to qualify as a valid predicate for the career offender

enhancement.

III.   **BACKGROUND**

A.   **Elion's Conviction and Sentencing**

On November 8, 2016, Otis R. Elion was indicted for distribution of methamphetamine. Elion's Presentence Investigation Report ("PSR") categorized him as a career offender because he had three prior drug crime convictions: a federal conviction in 2006 and two Illinois convictions; one in 2000 and another in 1999 (hereinafter "2000 conviction" and "1999 conviction" respectively).

However, Elion believed that neither of his Illinois convictions were valid predicates because they were convictions for "look-alike" substances, not actual controlled substances. Also, because he had been convicted for a comparatively small amount of drugs in the past, Elion believed that it was unjust to apply the career offender enhancement to him. Elion wanted his attorney, Judith Kuenneke, to object to the enhancement on those grounds. Yet, Kuenneke refused to do so, believing his objections were meritless. Instead, Kuenneke raised other arguments in mitigation. Kuenneke did argue that the career offender enhancement is generally unfair to nonviolent offenders, but did not object to the enhancement as it applied to Elion.

On April 26, 2017, this Court found that Elion was a career offender and sentenced him to 167 months in prison.

B.   **Elion's § 2255 Petition**

On December 13, 2017, approximately eight months after his sentencing, Elion moved to vacate or adjust his sentence pursuant to 28 U.S.C. § 2255.

In his § 2255 petition, Elion raised a new argument. He argued, because Section 404(b) proscribed "advertis[ing]" a controlled substance while the Guideline definition of a "controlled substance offense" did not prohibit "advertising"; that Section 404(b) was not a categorical

match with the Guidelines. Consequently, neither of his Illinois convictions were valid predicates for the career offender enhancement. If that were true, then Elion was incorrectly sentenced as a career offender. Elion believed that Kuenneke provided ineffective assistance of counsel by refusing to raise this categorical approach argument at his sentencing. Elion's convictions at controversy were:

- A 1999 Illinois conviction for unlawful delivery of a look-alike substance within 1,000 feet of public housing property, in violation of 720 ILL. COMP. STAT. 570/407(b)(3). (Section 407(b)(3)).

- A 2000 Illinois conviction for unlawful delivery of a look-alike substance, in violation of 720 ILL. COMP. STAT. 570/404(b). (Section 404(b)).

This Court found that both convictions qualified as valid predicates for the career offender enhancement. The Court determined, because he was not prejudiced by Kuenneke's refusal to object, that Kuenneke provided effective assistance. Accordingly, the Court denied his petition.

## C. **Elion's Appeal**

On appeal, the Appellate Court compared the Illinois statutes of Elion's convictions to the Sentencing Guideline definition of a "controlled substance violation." As Section 407(b)(3) was an enhancement statute for Section 404(b), the Court of Appeals applied the categorical approach to Section 404(b).

The Court of Appeals found two potential mismatches between Section 404(b) and the Guidelines: [2] (1) Section 404(b) uses the term "look-alike substance" whereas the Guidelines use the term "counterfeit substance;" and (2) Section 404(b) uses the term "advertise" whereas the Guideline definition does not. Because there were potential mismatches between Section 404(b) and the Guidelines, the Court of Appeals analyzed both.

---

[2] The Seventh Circuit refers to the "counterfeit" and "look-alike" issue as a "potential mismatch." For ease of reading and reference, "mismatch" or "potential mismatch" are used interchangeably throughout this opinion. This should not be taken to imply that there is or is not a mismatch.

The Appellate Court did not resolve whether Illinois's look-alike statute was a categorical match with the Guideline definition, but indicated the issue would require careful consideration in the future. Addressing the "advertise" mismatch, the Court of Appeals found that the term "advertise" made Section 404(b) broader than the Guidelines. The Appellate Court conducted a divisibility analysis on Section 404(b); that analysis was complicated by the fact that Elion's *Shepard* documents show that he was charged and convicted for unlawful "delivery" of a controlled substance, but the term "delivery" does not appear in Section 404(b). After exhausting all available analytical tools, the Appellate Court found that Section 404(b)'s divisibility was ambiguous. Since anything short of certainty requires that courts treat the statute as indivisible, the Court of Appeals treated Section 404(b) as indivisible.

As Section 404(b) was both broader than the Guidelines and indivisible; the Court of Appeals concluded that Section 404(b) offenses—including Elion's Illinois convictions—cannot be used as predicates for the career offender enhancement. Because at least two valid convictions are required for the career offender enhancement, and Elion only had one valid conviction in 2006 remaining, Elion did not qualify as a career offender. Therefore, Elion was incorrectly sentenced, and he was prejudiced by Kuenneke's failure or refusal to object.

The Court of Appeals declined to analyze whether Kuenneke was deficient and remanded the case on that question. The Appellate Court indicated that *Bridges v. United States* would be helpful in this Court's analysis. *See Bridges*, 991 F.3d at 793.

### D. Evidentiary Hearing

The Court called an evidentiary hearing to obtain more information on Kuenneke's performance, research, and reasoning. (Docs. 68, 79).

Kuenneke testified that she looked at both of Elion's prior state convictions. (Doc. 80).

Upon reading the text of the statute, she noticed the potential mismatch between "counterfeit" and "look-alike." (*Id.*). Additionally, she noticed the potential mismatch involving "advertising." However, she did not explicitly include this information in her affidavit. *See* (Doc. 13, Ex. A.).

Ultimately, Kuenneke concluded that there was no mismatch between "counterfeit" and "look-alike." While she concluded there was a mismatch between Section 404(b) and the Guidelines based on "advertising," she also concluded that "delivery" and "distribute" were interchangeable and that Section 404(b) was divisible. Then, applying the modified categorical approach, Kuenneke determined that Elion's Illinois convictions qualified as valid predicates for the career offender enhancement.

### 1.  **Kuenneke's Analysis of Section 404(b)**

Elion was convicted of a Section 407(b)(3) violation in 1999, and a Section 404(b) violation in 2000. Ordinarily, a categorical approach analysis would involve analyzing both Sections 407(b)(3) and 404(b). However, Section 407(b)(3) is an enhancement statute for Section 404(b). As it is impossible to perform a *Mathis* analysis on an enhancement statute, a categorical approach analysis of either conviction required analyzing Section 404(b).

The first step of the analysis was identifying the correct statute (Section 404(b)). Kuenneke testified that she identified the underlying statute and performed a *Mathis* analysis on Section 404(b):

> Q: Okay. So here's 570/407(b)(3)[, the penalty statute]. Did you take a look at this subsection?
> A: Yes.
> Q: What were you able to determine about this subsection?
> A: That subsection directed me to [Sections] 401 or 404.
> Q: Okay. And why are you able to follow the cross reference and why not stop here at [the penalty statute, Section 407](b)(3)?
> A: Because [it] is a penalty statute.
> Q: Okay.
> A: You can't do a *Mathis* analysis on a penalty statute.

Evid. Hr'g. Tr., 21:24-22:10, Mar. 6, 2024 (Doc. 80). When Kuenneke was asked what statutes

applied to Elion, she responded that Section 404(b) applied to both convictions:

> Q: And what's [Section] 404?
> A: [Section] 404 is the actual charging statute.
> Q: Okay. That's the look-alike statute we were looking at earlier [for the
>     2000 Conviction]?
> A: Correct.
> Q: So at this point you have determined that the 1999 conviction is under [Section
>     404(b)]
> A: Correct.
> Q: The same statute as the 2000 conviction –
> A: Yes.
> Q: – that we looked at earlier?
> A: My notes reflect that they are the same statute to be analyzed, yes.

Evid. Hr'g. Tr., 23:3-15, Mar. 6, 2024 (Doc. 80). Having determined that Section 404(b) was the

applicable statute, Kuenneke applied the categorical approach. She recognized the two potential

mismatches between Section 404(b) and the Guidelines—the "look-alike" mismatch and the

"advertising" mismatch.

### 2.  Kuenneke's Analysis of the "Look-alike" Potential Mismatch

Kuenneke recognized that the Guidelines used the term "counterfeit" while Section

404(b) used the term "look-alike"; Kuenneke researched both terms. She found that, while the

Seventh Circuit had not ruled on Illinois's look-alike statute before, the Seventh Circuit had

ruled on a similar Indiana statute. *United States v. Hudson*, 618 F.3d 700, 701 (7th Cir. 2010).

In *Hudson* the Seventh Circuit determined that the term "counterfeit," as it is used in the

Guidelines, included two elements: a "made in imitation" element and an "intent to deceive."

Thus, for the Indiana statute to be a categorical match with the Guidelines, the term "look-alike"

in Indiana's statute must include those same two elements; the Seventh Circuit determined that it

did, and that Indiana's statute was a categorical match with the Guidelines. Though *Hudson* did

not address the Illinois law, the Appellate Court cited an earlier, Eighth Circuit case that *did*

analyze the Illinois statute. *United States v. Robertson*, 474 F.3d 538, 538 (8th Cir. 2007). Before

the Seventh Circuit had decided *Hudson*, the Eighth Circuit, based on similar reasoning, had

concluded that the term "counterfeit" in the Guidelines included the same two elements,

(imitation and deception) and that Illinois's definition of "look-alike" included those same

elements. *Id.* Therefore, both Appellate Courts found the respective Indiana and Illinois statutes

were categorical matches with the Guidelines. Kuenneke found *Hudson* first, which led her

directly to *Robertson*. Evid. Hr'g. Tr., 24:10-25:15, Mar. 6, 2024 (Doc. 80).

Kuenneke was asked what part of the Illinois statute she believed included an intent to

deceive. She pointed to the "would lead a reasonable person to believe" language. Evid. Hr'g.

Tr., 83:10-85:2, Mar. 6, 2024 (Doc. 80). Based on her research, supported by her own

interpretation of the statute and case law, Kuenneke concluded that Illinois's definition of "look-

alike" included both an imitation and deception element. Based on that determination, finding no

contradictory authority, Kuenneke concluded that Elion had no categorical approach argument

on the "look-alike" potential mismatch.

### 3.  **"Advertise" Mismatch and Divisibility**

Unlike "look-alike" mismatch, where there were similar terms to compare, Section

404(b) included "advertise" while the Guidelines did not. Kuenneke concluded on that basis that

Section 404(b) was not a categorical match.[3] However, if applying the categorical approach

yields a mismatch, the analysis does not end; a divisibility analysis is required.

---

[3] Originally, the Government had argued "advertising" fell within the scope of the Guidelines, but the Court of
Appeals disagreed. The Petitioner attempts to conflate Kuenneke's analysis with the Government's analysis, arguing
that, because Kuenneke's affidavit was used to support the Government's argument, that she came to a similar
conclusion. There is no indication from her affidavit or testimony that she came to the same conclusion as the
Government. The Court sees no reason to impute the Government's position onto Kuenneke's.

Accordingly, Kuenneke proceeded with a divisibility analysis. She began by searching for Illinois case law on Section 404(b). She could find no Illinois Supreme Court case law on the issue, and she did not specify whether she looked at state intermediate court opinions. Kuenneke also searched federal case law, but found nothing on point.

Unable to find case law, Kuenneke turned back to the text of the statute for clues as to the statute's divisibility. In her affidavit, Kuenneke noted that the statute listed multiple "felony classifications," and, she believed, listed multiple discrete offenses. While her findings were not dispositive, this implied that the statute was divisible. However, an implication is insufficient, so Kuenneke moved forward with the divisibility analysis.

Next, Kuenneke moved to Elion's *Shepard* documents. She noticed that Elion's Illinois convictions used the term "delivery" while Section 404(b) did not. If "delivery" meant that Elion was convicted of a general violation of Section 404(b), then the statute was indivisible. However, if "delivery" was synonymous with a specific, discrete offense in Section 404(b), that would suggest divisibility. "Distribute" or "dispense" were the most analogous to "delivery," and, based on Kuenneke's extensive experience with Illinois convictions, "delivery" and "distribute" were used interchangeably.

While Kuenneke's training and experience led her to believe the two terms were interchangeable, she searched for evidence that may support that conclusion. To that end, she researched the plain meaning and statutory definitions of both terms and searched for relevant case law. Kuenneke found no case law within nor outside the Seventh Circuit on this issue. Though unable to find out-of-circuit case law on the Illinois definition of "delivery," Kuenneke did find a Fifth Circuit case dealing with a similar, Texan statute. *United States v. Hinkle*, 832 F.3d 569, 569 (5th Cir. 2016).

In *Hinkle*, the Fifth Circuit evaluated whether a conviction under Texan law for "delivery" of a controlled substance matched the Guideline definition; specifically the Fifth Circuit asked "whether the definition of 'deliver' in [the Texan statute] . . . sets forth different offenses such that delivering a controlled substance by 'offering to sell' [a controlled substance] is a separate and distinct offense from delivering a controlled substance by 'transfer.'" *United States v. Hinkle*, 832 F.3d at 573. The Fifth Circuit found the Texan delivery statute was *not* divisible and that a conviction for delivery could *not* be used as a valid predicate for the career offender enhancement. After analyzing *Hinkle*, Kuenneke determined that it would not apply to Elion's situation. *See* (Doc. 13 Ex. A at 5).

Having found neither mandatory nor highly persuasive authority on the "distribute" and "delivery" interchangeability issue, Kuenneke turned back to the text. It is at this point in the analysis that the Seventh Circuit's and Kuenneke's analyses diverged. The Seventh Circuit ultimately concluded that whether the terms were interchangeable was ambiguous. Kuenneke, on the other hand, based on her legal and definitional research and her own personal experience in hundreds of cases involving Illinois drug convictions through twenty-nine years of practice, concluded that "delivery" and "distribute" *were* interchangeable.

> Q: Okay. So when the Seventh Circuit looked at those *Shepard* documents . . . and saw "delivery," they thought it was ambiguous because it sounded – but it sounds like it wasn't ambiguous to you?
> A: No.
> Q: Why wasn't it ambiguous to you?
> A: I had researched both terms, and I've also dealt with Illinois state paperwork. "Delivery and "distribution" are usually used interchangeably. That's based on my experience.
> Q: And when you say your "experience," you said you have done hundreds of drug cases?
> A: Yes.
> Q: All here in Illinois?
> A: Yes.

14

> Q: And typically in those cases you would be pulling those kind of record documents?
> A: Yes.
> Q: So in your capacity as a Federal Public Defender, you have looked at those kind of documents in hundreds of cases?
> A: Correct.

Evid. Hr'g. Tr., 28:17-29:14, Mar. 6, 2024 (Doc. 80). Because Kuenneke determined that "distribute" and "delivery" were interchangeable, she concluded that Elion was convicted of the discrete offense of "distribution" of a controlled substance. The presence of one discrete offense at the exclusion of others within Elion's *Shepard* documents, in combination with the other indicators in the divisibility analysis, was enough to conclude that Section 404(b) was divisible.

Having determined that Section 404(b) was divisible, Kuenneke applied the modified categorical approach. Elion's *Shepard* documents showed that he was convicted of "delivery" of a "look-alike" substance and Kuenneke had already determined that "delivery" and "distribute" are interchangeable. Therefore, Kuenneke needed to evaluate whether "distributing" a "look-alike" substance was conduct covered by the Guidelines. While the discrete offense of "advertising" was not within the scope of the Guidelines, the discrete offense of "distribution" was. Accordingly, Kuenneke concluded that Elion's 1999 conviction was a valid predicate for the career offender enhancement.

Having concluded that Elion's 1999 conviction was a valid predicate, Kuenneke determined that Elion had at least two valid predicates for the enhancement: his 2006 federal conviction and his 1999 Illinois conviction. Kuenneke did not apply the modified categorical approach to Elion's 2000 conviction. Regardless of the outcome of that analysis—whether valid or invalid—as two valid predicates are all that is required for the career offender enhancement and Elion had two valid predicate convictions, Kuenneke concluded that Elion qualified as a career offender.

15

Kuenneke had applied the categorical approach to both potential mismatches and concluded that Elion's two convictions fell within the scope of those Guidelines. There being no other mismatches, Kuenneke determined that objecting to Elion's career offender status would be meritless. When asked why, despite her conclusions, she did not make the argument regardless, Kuenneke replied that she "didn't believe it was a viable objection to present to the Court," and that she does not raise meritless arguments. Evid. Hr'g. Tr., 33:22-23, Mar. 6, 2024 (Doc. 80)

Though Kuenneke had determined there was no viable objection to Elion's career offender status, Kuenneke made other mitigation arguments that she felt were more viable:

> [Kuenneke] made basic arguments under 3553(a). [She] discussed [Elion's] childhood, that he was raised in poverty; and that he suffered childhood abuse; that he lived in a gang-infested area; that he joined a gang at an early age; that he accrued many of his prior convictions while he was in a gang.
> [She] discussed his substance abuse issues, his mental health issues. [She] discussed his health issues and how his health issues would impact his care in the federal prison. [She] discussed his life expectancy. [She] believe[s] [she] also addressed recidivism arguments [and] touched on those.

Evid. Hr'g. Tr., 36:18-37:4, Mar. 6, 2024 (Doc. 80). Kuenneke also detailed the research steps she took in developing those other mitigation arguments. She also raised an objection to the career offender designation generally, arguing that the enhancement is flawed because nonviolent offenders or prior convictions for small amounts of drugs receive harsher sentences than even many violent criminals. However, Kuenneke did not raise the specific argument that Elion was not a career offender. Evid. Hr'g. Tr., 40:11-41:3, Mar. 6, 2024 (Doc. 80).

## IV.   FACTUAL ANALYSIS

Kuenneke's affidavit, testimony, and both briefs dispute Kuenneke's level of research, competency, and honesty. The Court has identified the following factual questions:

- Whether Kuenneke identified that Section 404(b) was the underlying statute for both of Elion's convictions;

- Whether Kuenneke noticed the potential mismatch between Section 404(b)'s inclusion of "advertis[ing]" and the absence of "advertising" from the Guideline definition of a controlled substance offense; if so, what the extent and depth of her research was;

- Whether Kuenneke noticed the potential mismatch between the definition of "look-alike substances" and "counterfeit substances" in the Guideline definition of a controlled substance offense; if so, what the extent and depth of her research was;

- Whether Kuenneke recognized the mismatch between the use of the term "delivery" in Elion's *Shepard* documents, and the term "distribute" in Section 404(b); if so, what the extent and depth of her research was;

- Whether Kuenneke performed a *Mathis* analysis on Section 404(b) or Section 407(b)(3); if so, whether she performed that analysis properly;

- Whether Kuenneke performed a divisibility analysis on Section 404(b); if so, whether she performed that analysis properly;

- Whether Kuenneke had a sufficient basis to conclude that "delivery" and "distribute" are interchangeable;

- Whether Subsection c of Kuenneke's affidavit was truly written in error; if so, whether Kuenneke had a reasonable basis to conclude that analyzing Elion's 2000 conviction was unnecessary; and

- Whether Kuenneke's testimony was truthful.

The Petitioner argues that Kuenneke's performance was deficient because she failed to identify Section 404(b) as the underlying statute, failed to notice both mismatches, failed to notice an error in the Eighth Circuit's opinion in *Robertson*, performed a *Mathis* analysis on the wrong statute, failed to adequately research the issues, fundamentally misunderstood the categorical approach, and failed to properly conduct a divisibility analysis. Additionally, to the extent that Kuenneke's testimony expands on or differs from her affidavit, the Petitioner alleges

that Kuenneke's testimony is dishonest and not credible. The Petitioner is mistaken. Kuenneke identified the proper statutes, performed the relevant analyses properly, had sufficient basis for her conclusions, and her testimony was truthful.

### A.  The "Look-Alike" Potential Mismatch

Kuenneke did not *explicitly* write that she noticed the "look-alike" potential mismatch in her affidavit. From that omission, the Petitioner infers that Kuenneke did not notice the mismatch. Failing to notice this mismatch and "fail[ing] to press" this "obvious argument" is one of "two glaring errors" that "underscores [Kuenneke's] deficient performance." (Doc. 84 at 15).

While Kuenneke testified to noticing this potential mismatch at the evidentiary hearing, the Petitioner points out that this is "the first time" Kuenneke has explicitly claimed to have "researched this issue by looking to Seventh Circuit [case] law, Illinois state law, and statutory definitions." (*Id.*) (citing Evid. Hr'g. Tr., 79:10-13, Mar. 6, 2024 (Doc. 80)). The Petitioner argues that Kuenneke's testimony was dishonest and "self-serving." However, even if Kuenneke noticed the mismatch, the Petitioner argues that Kuenneke still failed to perform proper research into the issue.

During her testimony, Kuenneke mentioned the Eighth Circuit's *Robertson* decision. The Petitioner takes issue with Kuenneke's reliance on *Robertson*. Not only does the Petitioner believe that Kuenneke improperly based her *entire* conclusion on that "one out-of-circuit case alone," (*Id.* at 16), the Petitioner also argues, that *Robertson* "materially misquoted [Illinois's look-alike statute] in its analysis by connecting prongs in the statutory definition of 'look-alike substance' with [the conjunction] 'and' rather than [the conjunction] 'or.'" (*Id.* at 15) (citing Evid. Hr'g. Tr., 96:1-23, Mar. 6, 2024 (Doc. 80)). Kuenneke's failure to "evaluate *Robertson* closely enough" to realize this alleged error is further evidence of her incompetence because

"[c]ompetent counsel would have realized that this Court owes no deference to another circuit's misquote," (*Id.*).

The Petitioner pressed Kuenneke on this alleged misquotation—a misquotation the Petitioner claims was acknowledged by the Seventh Circuit in this case, on appeal:

> Q. All right. Mr. Reed also asked you about another case you reviewed. It's the *Robertson* case out of the Eighth Circuit. You are familiar with that case?
> A. Yes.
> Q. Right? You are aware that in *Robertson* the Eighth Circuit reviewed the Illinois look-alike statute; right?
> A. Yes.
> Q. And are you also aware that the Eighth Circuit misquoted the statute in its analysis?
> A. No. I don't recall — I don't recall that.
> Q. You said you are familiar with the Seventh Circuit's decision in this case?
> A. Yes.
> Q. Is that right? And you have read that decision?
> A. I have.
> Q. <u>You are aware that the Seventh Circuit in this case pointed out that the Eighth Circuit had misquoted *Robertson*?</u>
> A. I don't recall. I'm not saying it's not there; just I don't recall.

Evid. Hr'g. Tr., 96:1-23, Mar. 6, 2024 (Doc. 80) (emphasis added).

The Petitioner's arguments are flawed for a multitude of reasons.

### 1. <u>Kuenneke's Testimony Does Not Contradict her Affidavit</u>

The Petitioner views Kuenneke's affidavit as a complete record of her research—any omissions are intentional. Any testimony that sheds light on the omissions, the Petitioner casts as a "new story." In other words, the Petitioner takes the position that, if it is not within the four corners of the affidavit, it did not occur; any testimony that describes research beyond those four corners is contradictory and should be disregarded under the sham affidavit doctrine.

The sham affidavit doctrine is reserved for situations where testimony clearly contradicts a prior sworn statement, without explanation. It would be unrealistic and inefficient to demand that attorneys include every search, every document, and every theory they pursued in their

19

research and representation. Kuenneke's affidavit was drafted in response to Elion's specific claims; it stands to reason that, as an experienced attorney, Kuenneke included only information she believed was commensurate with those claims. At the time of Kuenneke's affidavit, multiple appellate courts had found that "counterfeit" and "look-alike" were categorical matches—including the Seventh Circuit (in the context of Indiana's statute in *Hudson*) and the Eighth Circuit (in the context of Illinois's statute in *Robertson*). It is easy to look back at Kuenneke's affidavit with the benefit of hindsight and demand additional details on the specific issues where the legal landscape has since changed; but, to the best of their ability, courts are called to remove hindsight from the analysis. Defense attorneys have limited time and heavy caseloads; it would be counterproductive and inefficient to demand that they spell out every single search they carried out and every single case they found in excruciating detail, on the off chance that the legal landscape may change on a specific issue, transforming previously irrelevant, extraneous information into relevant and material information. Additionally, as Elion's former attorney, Kuenneke may be reluctant to disclose unnecessary detail related to her representation of Elion. Testimony that supplements and clarifies her representation is not inherently contradictory; the Court sees no reason to read and interpret Kuenneke's affidavit according to the Petitioner's "four corners" approach.

Moreover, while it is true that Kuenneke did not *explicitly* write that she noticed the "look-alike" and "counterfeit" mismatch, on closer inspection, it is apparent from her affidavit that she did.

Elion's § 2255 petition specifically raised the issue of the "advertising" mismatch; however, Elion initially had taken issue with his "look-alike" convictions being used to enhance his sentence. The Court finds it highly unlikely Kuenneke would have not researched the *specific*

20

issue that Elion raised at the time of his sentencing. In an email to Elion, she informs him that he qualifies as a career offender based on his two "look-alike" offenses. (Doc. 13, Ex. A at 3). In the *very next sentence* Kuenneke writes "[i]n a footnote, counsel added, 'According to the U.S. Sentencing Guidelines, the term 'controlled substance violation' includes counterfeit substances. U.S.S.G. § 4B1.2(b)." (*Id.*). Kuenneke then adds: "Mr. Elion requested information on the use of *look-alike drugs convictions for application of the career offender enhancement*. Affiant informed Mr. Elion that she had *requested the paperwork on the prior state convictions*." (*Id.* at 4) (emphasis added). After more than two months, Kuenneke met with Elion again. Kuenneke wrote that she had "researched the applicable law including *Mathis*," (*Id.*), and, at that meeting, that her and Elion discussed "*the research on look-alike convictions*, and the career offender enhancement and three drug offenses" (*Id.*) (emphasis added).

The Petitioner would have the Court believe that Kuenneke was so deficient that she not only failed to notice the potential "look-alike" mismatch after Elion raised that *specific issue*, after she wrote an email detailing her findings, after she reviewed the Guideline definition of a controlled substance offense, after she had requested Elion's *Shepard* documents for a divisibility analysis, and after she met with Elion and discussed her research *specifically* concerning the applicability of "look-alike" substance offenses for the career offender enhancement with him. Then, that Kuenneke proceeded to perjure herself.

It strains credulity.

Furthermore, the Petitioner's argument is internally inconsistent. The Petitioner does not dispute that she requested and reviewed Elion's *Shepard* documents, but she would have no reason to request those documents unless she noticed at least one mismatch between the Illinois statute and the Guidelines. The Petitioner's argument is a catch-22: either Kuenneke was so

deficient that she compared the statute with the Guidelines, saw no mismatch, and, therefore, would have no need to request Elion's *Shepard* documents; or alternatively, Kuenneke correctly identified the mismatch (as Kuenneke claims in her testimony), requested the *Shepard* documents, and performed an allegedly faulty divisibility analysis (as the Petitioner later claims for the "advertising" mismatch). Both scenarios cannot be true.

The Petitioner may argue that Kuenneke requesting Elion's *Shepard* documents is not dispositive; that she may have requested those documents in anticipation of a categorical approach analysis, not because she actually saw those mismatches. Yet, that argument is still inconsistent; it suggests that Kuenneke is both familiar enough with the categorical approach and divisibility analysis to know which documents to request, but that she was so ignorant of the categorical approach that she did not even know how to perform the *very first step* of that same analysis.[4] Given reviewing *Shepard* documents is only necessary late in a divisibility analysis (or when applying the modified categorical approach); no matter how the Petitioner may attempt to frame it, Kuenneke clearly had *some* familiarity with the categorical approach.

The Petitioner's argument is also difficult to square with Kuenneke's background. Kuenneke has nearly thirty years of experience, she is a veteran defense attorney, and she was assigned specifically to habeas petitions in the past—after *Mathis* was decided. Evid. Hr'g. Tr., 45:18-25, Mar. 6, 2024 (Doc. 80). It is difficult to believe, given the wealth of experience in criminal law and specifically with post-*Mathis* habeas petitions, that Kuenneke would be entirely unfamiliar with the basic tenets of *Mathis* or be unaware of how to perform that analysis.

---

[4] The same is true if the Petitioner argues that Kuenneke noticed the "advertising" mismatch and only requested Elion's case documents for that reason. In fact, given the Petitioner also argues that Kuenneke failed to notice the "advertising" mismatch, the Petitioner's argument would be even more contradictory given the majority of the Petitioner's argument is dedicated to discrediting Kuenneke's purported knowledge of the "advertising" mismatch.

The Petitioner argues that Kuenneke's testimony is dishonest and should be disregarded. However, in her initial affidavit, Kuenneke voluntarily, and without prompting, offered her notes for review in camera. (Doc. 30, Ex. A at 3 n. 1). While the Court did not review those notes, had the Court reviewed them, it would quickly become apparent whether Kuenneke perjured herself or not. It would be exceedingly unwise for Kuenneke to perjure herself with full knowledge that she offered her notes for the Court's review, in some enormous gambit that the Court would not review them. If, as the Petitioner alleges, Kuenneke has lied in an "attempt to preserve her professional reputation," (Doc. 84 at 13), perjury would be far more damaging to her reputation than admitting she failed to research a new and highly granular categorical approach argument. The consequences for perjuring herself—especially in a habeas case—would be dire, and far more egregious than being found ineffective for not performing the research in the first place. Guilty people generally do not willingly offer up blatantly incriminating evidence for the Court's review, especially not veteran defense attorneys. No one requested to view her notes, she offered them up unprompted; if she had lied, it would be senseless to take such an enormous, grave, and unnecessary risk.

For all these reasons, the Court finds that Kuenneke noticed the "counterfeit" and "look-alike" potential mismatch, that she researched the issue, and that her testimony was truthful and not inconsistent with her affidavit.

### 2. **Kuenneke did not over-rely on _Robertson_**

The Petitioner makes a variety of claims related to _Robertson_—the Eighth Circuit case that found Illinois's look-alike statute contained an "intent to deceive" element and, therefore, was a categorical match with the Guidelines. The Petitioner argues that Kuenneke impermissibly relied on _Robertson_, because "competent counsel also would have known that one out-of-circuit

case alone is not enough to take a categorical approach argument off the table." (Doc. 84 at 16). The Petitioner either misunderstands or mischaracterizes *Robertson* and Kuenneke's research.

First, Kuenneke did not rely on *Robertson* alone, she also relied on *Hudson*. While *Robertson* was an out-of-circuit case, *Hudson* was not. *Hudson* is not only mandatory authority in this Circuit, it favorably cited *Robertson*—that alone elevates *Robertson*'s persuasive authority beyond being merely "one out-of-circuit case."

Second, while *Robertson* was not mandatory authority, *Hudson* was decided using highly similar reasoning. While *Robertson* concerned Illinois's statute and *Hudson* concerned Indiana's, placing the two statutes next to one another reveals that the language is nearly identical.[5] This not only lends further persuasive value to *Robertson*'s ruling specifically, it also supports a conclusion, based *purely* on a reading of *Hudson*, that the Illinois look-alike statute was a categorical match with the Guidelines.

Third, the Seventh Circuit noted in its opinion in *Hudson* that its holding aligns with the rulings of *four* other federal appellate courts. The existence of other appellate case law—that Kuenneke would necessarily be aware of after having read *Hudson*—may have added more weight to her conclusion that "look-alike" and "counterfeit" were a categorical match, but they were not directly relevant to Illinois's look-alike statute; *Robertson*, however, was. *Hudson* was included in Kuenneke's affidavit because it was controlling authority; *Robertson* was included because it analyzed Illinois's look-alike statute specifically. Her inclusion of *Robertson* does not in any way imply that her conclusion was based *solely* on *Robertson* given the existence of other,

---

[5] The language in the Indiana and Illinois statutes are identical, but they differ in organization. *Compare* IND. CODE § 35-48-4-4.5(a) (2010) (repealed 2019) *with* 720 ILL. COMP. STAT. 570/102(y) (2007). Both states lay out three definitions for a "look-alike" substance; however, whereas Indiana separates the definition into three separate subsections (ex. § 4.5(a)(1), (2), (3)), the Illinois folds two of the criteria into one subsection with two prongs (ex. §102(y)(1)(a), (y)(1)(b), 102(y)(2)).

similar appellate case law. It merely demonstrates that Kuenneke determined *Robertson* was particularly relevant to the issue at hand. The Court does not subscribe to the Petitioner's "four corners" interpretation of Kuenneke's affidavit; while Kuenneke did not mention finding additional authority, that does not mean she did not find them or consider their persuasive value.

Fourth, Kuenneke did not just rely on *Robertson* and *Hudson* to come to her conclusions. Setting aside case law, Kuenneke *still* performed her own analysis by researching the different definitions of "counterfeit" and "look-alike." Based on her research, her own reading and interpretation of the statute, supportive case law, and the absence of negative case law; Kuenneke concluded that "counterfeit" and "look-alike" were a categorical match.

Thus, Kuenneke's conclusion was not supported solely by one "out-of-circuit" case, nor supported even by multiple "out-of-circuit" cases; it was also supported by her reading of *Hudson* and her own interpretation of the statute. While no single factor is dispositive, taken in totality, it is clear that Kuenneke did not solely or overly rely on *Robertson*.

### 3.  <u>There is No Error in *Robertson*</u>

The Petitioner argues that *Robertson* misquoted Illinois's look-alike statute. The relevant part of the Illinois look-alike statute is as follows:

> [A] substance, other than a controlled substance which . . . (2) is expressly or impliedly represented to be a controlled substance <u>or</u> is distributed under circumstances which would lead a reasonable person to believe that the substance is a controlled substance.

720 ILL. COMP. STAT. 570/102(y) (2007) (emphasis added). The alleged misquote comes from the following passage of *Robertson*:

> Facially, it is readily apparent that (y)(1) and (y)(2) each includes the "made-in-imitation" component of "counterfeit." Turning to the "intent-to-deceive" component, the plain language in (y)(2) — <u>"expressly or impliedly represented" *and* "distributed under circumstances which would lead a reasonable person to believe that the substance is a controlled substance"</u> — clearly contains an intent-to-deceive element.

*Robertson* at 542 (emphasis added).

The Petitioner argues that in its discussion of Section 102(y)(2), the Eighth Circuit—"by [linking] prongs in the statutory definition of 'look-alike substance' with [the conjunction] 'and' rather than [the conjunction] 'or.'"—erroneously found that it was *both* the "expressly and impliedly represented" prong *and* the "distributed under circumstances" prong of Section 102(y)(2), in *combination*, that indicated intent; rather than the two prongs *separately* including intent. (Doc. 84 at 15) (citing Evid. Hr'g. Tr., 96:1-23, Mar. 6, 2024 (Doc. 80)). According to the Petitioner, this error materially changes the *Robertson* holding.

The Petitioner is mistaken.

Firstly, even if there was an error in *Robertson*, the Petitioner argues that no competent counsel would have missed this purported error. That is a bold claim given that, in the seventeen years since *Robertson* was decided by the Eighth Circuit, the Seventh Circuit and multiple other courts have read and cited *Robertson* on multiple occasions and none have noticed this purported error. While it is certainly *possible* this error has been missed by all but the Petitioner, it is paradoxical to argue that an error is so obvious that an attorney would be incompetent for failing to notice it when it has gone unnoticed by hundreds of attorneys, judges, and jurists in the seventeen years since it was decided. Given an ineffective assistance of counsel analysis relies on prevailing professional norms, the argument is especially contradictory and self-defeating.

Secondly, contrary to the Petitioner's assertions, *Robertson* neither misread nor misstated the law. It is difficult to believe that the Eighth Circuit misstated the law two sentences after

26

directly quoting it. Moreover, the difference between the conjunctions "and" and "or" in a statute can be incredibly consequential, thus it is even more difficult to believe the Eighth Circuit would confuse the two. For those reasons alone, the Court finds the Petitioner's reading of *Robertson* unpersuasive. Under further inspection, the Petitioner's argument continues to unravel.

The two prongs of Section 102(y)(2) contain two verbs describing two separate acts: "represent[ing]" and "distribut[ing]"; whether those acts, listed in Section 102(y)(2), included an intent to deceive was *not* at controversy in *Robertson*. What was at controversy in *Robertson* was whether Section 102(y)*(1)* included an intent to deceive. Section 102(y)(1), in contrast to Section 102(y)(2), defines a "look-alike" substance, not based on conduct, but based *solely* on the substance's appearance or physical characteristics. The *Robertson* Court was skeptical that a substance's appearance or physical characteristics *alone*, absent accompanying conduct, included an element of deception. However, the *Robertson* Court found, supported by Illinois law, that there *was* an intent-to-deceive element in Section 102(y)(1). The *Hudson* Court came to a similar conclusion for Indiana's law using similar reasoning. Obviously, "representing" or "distributing" as conduct, *inherently* involves a higher level of intentional deception than merely possessing a substance that appears to be a controlled substance. It would be nonsensical to find that possessing a substance that merely *looks* like a controlled substance demonstrates an intent to deceive; but *actively* representing that substance as a controlled substance, or alternatively, distributing the substance the same way a controlled substance would be distributed, fails to demonstrate that same intent.

For all these reasons, it seems unlikely that the *Robertson* Court, by using the conjunction "and" when explaining Section 102(y)(2), meant that it is the combined prongs of 102(y)(2) that form intent. Instead, it seems far more likely that the *Robertson* Court used the conjunction

"and" to indicate that the two prongs of 102(y)(2) both share the same characteristic: an intent to deceive. Consequently, the Petitioner's interpretations of *Robertson* and Section 102(y)(2) are incorrect; there is no error in *Robertson*.

There is another matter the Court is obliged to address. The Petitioner's memorandum repeated the erroneous claim that *Robertson* misinterpreted the statute and faulted Kuenneke for failing to read *Robertson* closely enough to identify this "obvious" error. (Doc. 84 at 15). On cross-examination, the Petitioner asked Kuenneke if she was aware that the Seventh Circuit, in remanding this case, noted *Robertson*'s "misquotation" in their opinion:

> Q. You said you are familiar with the Seventh Circuit's decision [remanding] this case?
> A. Yes.
> Q. Is that right? And you have read that decision?
> A. I have.
> Q. You are aware that the Seventh Circuit in this case pointed out that the Eighth Circuit had misquoted *Robertson*?
> A. I don't recall. I'm not saying it's not there; I just don't recall.

Evid. Hr'g. Tr., 21:24-22:10, Mar. 6, 2024 (Doc. 80).

This is simply false.

The Seventh Circuit only briefly mentions *Robertson*. At no point did the Seventh Circuit write or even imply that the Eighth Circuit had misquoted or misinterpreted the Illinois statute. *See Elion* at 628, Slip Op. at 11.

### B.  "Advertise" Mismatch

The "advertising" mismatch was not explicitly mentioned in Kuenneke's affidavit. The Petitioner argues that Kuenneke's affidavit "makes clear that she misunderstood the law" by not performing the categorical approach correctly. In her affidavit, Kuenneke wrote that she thought Elion may have had a *Mathis* argument for his 2000 conviction, but, after reviewing his 1999 conviction, concluded that performing a *Mathis* analysis on his 2000 conviction was

28

unnecessary. The Petitioner argues that it is nonsensical to say Elion had a *Mathis* argument for his 2000 conviction but not for his 1999 conviction given both convictions were under the same underlying statute. The only logical explanation for Kuenneke's statement, the Petitioner alleges, is that Kuenneke analyzed the wrong statute; the Petitioner claims that Kuenneke performed a *Mathis* analysis on Section 407—the penalty statute—not Section 404—the underlying statute, and that is the source of this discrepancy. Kuenneke testifies otherwise, attributing the inconsistency to an error on her part in writing the affidavit. As before, the Petitioner disputes her honesty and, here too, the Petitioner is incorrect.

1. **It Would Have Been Infeasible for Kuenneke to Perform a *Mathis* Analysis on the Penalty Statute**

A *Mathis* analysis *requires* evaluating the *elements of an offense*. As an enhancement statute, Section 407(b)(3) does *not* set out unique offenses; it only provides enhanced penalties for offenses under other statutes based on proximity to certain locations.[6] Because Section 407(b)(3) does not list unique offenses, and a *Mathis* analysis requires an offense with elements to analyze; it would be infeasible for Kuenneke to perform a *Mathis* analysis on Section 407(b)(3) even if she wished to.

The only way the Petitioner's argument works is if Kuenneke looked at Section 407(b)(3), saw there were a variety of enhancements, erroneously concluded on that basis alone that Section 407 was divisible, jumped straight to Elion's *Shepard* documents, applied the modified categorical approach, and—given "delivery" appears nowhere in the statute or the

---

[6] While 720 ILCS 570/407(a) does list elements of an offense, is also an enhancement for Section 404(b), *and* includes some individualized elements; Section 407(b)(3) however, does not. The Petitioner correctly points out that the Government's initial response brief conflated Section 407(a) and Section 407(b), but that was an error on the Government's part and does not necessarily reflect Kuenneke's knowledge, understanding, or reasoning.

Guidelines—concluded solely on her intuition that "delivery" was a categorical match with "distribute." Such an approach is not only infeasible, it defies logic.

The *very first sentence* of Section 407(b)(3) integrates Section 404(b) by reference: "[a]ny person who violates . . . subsection (e) of Section 401 or Subsection (b) of Section 404." Section 407(b)(3). Kuenneke explicitly identifies this in her affidavit: "Affiant determined that Mr. Elion was charged pursuant to [Section] 407(b)(3), which states that anyone who violates . . . [*Section*] *404(b)* within 1000 feet of public housing is guilty of a Class 2 felony." (Doc. 13, Ex. A at 6) (emphasis added). Even presuming *arguendo* that Kuenneke sought to interpret Elion's 1999 conviction as a discrete offense under Section 407(b)(3), there would only be two "elements" to that fictitious discrete offense: proximity to public housing, and a violation of Section 404(b). The Guidelines do not provide proximity restrictions—meaning that "element" would be narrower than the Guidelines; that leaves only one "element" left to analyze: a violation of Section 404(b). Thus, even if Kuenneke erroneously believed that Section 407 was divisible, she would *necessarily* need to determine whether a violation of Section 404(b) is a match with the Guidelines as part of that analysis—which would require applying the categorical approach to Section 404(b). Put in simpler terms, even attempting an erroneous *Mathis* analysis on Section 407(b)(3) necessarily requires performing a *Mathis* analysis on Section 404(b).

Therefore, even if Kuenneke put the cart before the horse and jumped straight to the divisibility analysis, even if she treated Elion's Section 407(b)(3) conviction as a fictitious discrete offense, she would *still* need to evaluate Section 404(b) as an "element" of a Section 407(b)(3) violation.

2.  **Petitioner Makes Two Contradictory Arguments: That Kuenneke Both Performed the _Mathis_ Analysis on the Incorrect Statute and That She Came to a Flawed Conclusion for the Divisibility Analysis**

In Subsection d of Kuenneke's affidavit, Kuenneke described part of her process for evaluating Elion's 1999 conviction. She writes: "Affiant determined that _delivery_ of a controlled substance fell under the definition of _distribution_ or _dispensing_." (Doc. 13, Ex. A at 6) (emphasis added). Then, in analyzing Elion's 2000 conviction, Kuenneke explicitly mentions _Hinkle_. _Id._ at 5 ("Affiant also reviewed _United States v. Hinkle_, 882 F.3d 569 (5th Cir. 2016)"). While this part of the affidavit concerns Elion's 2000 conviction, her earlier mention of _Hinkle_, combined with Subsection d of her affidavit indicating she determined "delivery" and "distribute" were interchangeable, is further evidence that she analyzed the correct statute. Neither "delivery" nor "distribute" appear in Section 407(b)(3). Kuenneke would simply have no reason to search for or include _Hinkle_ in her affidavit, nor any reason to even investigate whether "delivery" and "distribute" were interchangeable—_unless_ she analyzed Section 404(b).

The Petitioner argues, because _Hinkle_ was decided outside of the Seventh Circuit and did not concern "advertising" a controlled substance, that Kuenneke's mention of _Hinkle_ further illustrates her lack of research and understanding. The Petitioner fails to understand _Hinkle_'s relevance. _Hinkle_ does not address the "advertising" issue; but it is _precisely because Hinkle_ does not address "advertising" that this fact weighs in Kuenneke's favor.

Kuenneke would only have performed a search that returned _Hinkle_ and included it in her affidavit if she believed it was relevant to Elion's claims—which concerned whether the term "advertising" in the Illinois statute made his convictions invalid predicates for the enhancement. _Hinkle_, however, evaluated whether Texas's "delivery" statute fit within the Guidelines. Again, the term "delivery" appears neither in Section 404(b) nor 407(b)(3). If the term "delivery" does

not appear in either of those statutes, it begs the question what possible relevance *Hinkle* could have, what possible reason Kuenneke would have for searching and including a case that chiefly concerned "delivery," and where she even got the term "delivery" from.

While "delivery" does not appear in the statutes, it does appear in Elion's *Shepard* documents. The only logical conclusion is that Kuenneke pulled the term "delivery" from Elion's *Shepard* documents. Yet, that begs the next question; which is why Kuenneke was analyzing Elion's *Shepard* documents at all. The only time *Shepard* documents are relevant is during a divisibility analysis or when using the modified categorical approach (which can only be performed *after* a divisibility analysis). Either way, if Kuenneke was looking at Elion's *Shepard* documents, she necessarily must have performed a divisibility analysis at some point. However, Kuenneke would only have performed a divisibility analysis if she noticed that Elion's statute of conviction was *not* a categorical match with the Guidelines. If Kuenneke had determined that the statute *was* a categorical match, there would be no need for a divisibility analysis, no need to inspect Elion's *Shepard* documents, no need to research whether "delivery" and "distribute" are interchangeable, and no need to search for *Hinkle* nor include it in her affidavit. In short, by reverse engineering Kuenneke's inclusion of *Hinkle*, the Court can reconstruct the steps she took in her analysis. That reconstruction reveals that, not only did Kuenneke notice a mismatch, she performed a divisibility analysis, and got to the point of that analysis where she analyzed Elion's *Shepard* documents.

The Petitioner alleges that Kuenneke noticed neither the "advertising" mismatch nor the "counterfeit" mismatch; however, those are the only two mismatches between Section 404(b) and the Guidelines. Yet, as explained above, it is evident that Kuenneke performed a divisibility analysis. Thus, the Petitioner finds himself in another catch-22: either Kuenneke noticed the

"advertising" mismatch and performed the divisibility analysis that led her to "delivery," and, in turn, to *Hinkle*; or alternatively, she noticed the "counterfeit" mismatch and reached *Hinkle* that way. There are a few possibilities, but all involve Kuenneke noticing a mismatch *somewhere* in Section 404(b), performing a divisibility analysis, noticing a mismatch between his *Shepard* documents and the Illinois statute, finding an analogous out-of-circuit case, and analyzing that case to a sufficient degree that she found it was not applicable. The Petitioner cannot claim Kuenneke did not notice either of the two lone mismatches between Section 404(b) and the Guidelines, and square that with Kuenneke's review of Elion's *Shepard* documents. Moreover, it cuts against the Petitioner's argument that Kuenneke did not know how to properly perform a *Mathis* or divisibility analysis. Kuenneke must have had some familiarity with the law and procedures. Furthermore, it is difficult to believe that Kuenneke was vigilant enough to notice and investigate a potential mismatch between Elion's *Shepard* documents and go through the process that would lead her to *Hinkle*, if, as the Petitioner contends, Kuenneke was oblivious to the fact she was analyzing the wrong statute.

The Petitioner may argue that Kuenneke finding and mentioning *Hinkle* had nothing to do with a divisibility analysis; rather, that *Hinkle* shows that Kuenneke erroneously jumped straight to the modified categorical approach to evaluate whether Elion's discrete offense of "delivery" falls within the Guidelines—without first performing the divisibility analysis. There are a few problems with that theory.

For one, it would suggest Kuenneke knew how to perform the modified categorical approach by comparing discrete offenses to the Guidelines, but that she was incapable of performing the step that *always* precedes the modified categorical approach: the divisibility analysis. Once again, the Petitioner finds himself in a bind; that argument would suffer from the

same paradox of alleged oscillating competency that plagues the Petitioner's other arguments: Kuenneke was both competent enough to find and read multiple cases demonstrating exactly how to perform the analysis, compare the statutes, and relevant case law; but was allegedly so woefully misinformed that she engaged in a course of impressive mental gymnastics to avoid the obvious and simplest conclusion—that a *Mathis* analysis *must* be performed on Section 404(b). Put simply, the Petitioner argues that Kuenneke compared multiple definitions, researched case law, reviewed Elion's *Shepard* documents, applied the modified categorical approach; then found, read, and analyzed *Hinkle*; but she did not realize at *any* point of that research or analysis that Section 404(b) was the appropriate statute to analyze. That seems improbable.

When evaluating competing theories, weighing the evidence, the simplest explanation is often the correct one. The Petitioner argues that Kuenneke, a seasoned defense attorney with decades of trial and habeas experience, was woefully incompetent yet, somehow, made wrong decisions at every single turn, exhibiting an inexplicable aversion to analyzing Section 404(b), but yet still noticed mismatches between Elion's *Shepard* documents and the statute, found an out-of-circuit case, and analyzed that case enough to determine it was not relevant. Between the Petitioner's proposed convoluted explanation, and the simple explanation of an error in writing her affidavit; the Court finds that a scrivener's error is the most likely explanation.

### 3.  Analysis of Elion's 2000 Conviction was Unnecessary and Does Not Indicate Kuenneke Failed to Properly Perform the Categorical Approach

Kuenneke wrote the following in her affidavit:

Affiant determined that argument on the 2000 conviction was unnecessary, as the 1999 and 2006, felony convictions were qualifying convictions for application of the career offender enhancement.

(Doc. 13, Ex. A at 5) (emphasis added). Kuenneke concluded that Elion's 2000 conviction did not require further research based on her review of the 1999 conviction.

Kuenneke described her analysis of Elion's 1999 conviction as follows:

> Affiant reviewed the Indictment and Amended Judgment in the <u>1999 Illinois state conviction</u> and determined that Mr. Elion was charged with, and pled guilty to, to one count of Unlawful Delivery of a Look-Alike Substance <u>within 1,000 Feet of Public Housing Property</u> pursuant to 720 ILCS 570/<u>407(b)(3)</u>. Affiant determined that this conviction qualified as a predicate conviction for the application of the career offender statute based on the following:
>
>     a. Pursuant to U.S.S.G. § 4B1.2(b), controlled substance violations may be state or federal convictions, and may include counterfeit substances that are dispensed or distributed.
>     b. Affiant determined that Mr. Elion was charged pursuant to 720 ILCS 570/<u>407(b)(3)</u> . . . which states that anyone who violated 570/401(e) or 570/<u>404(b)</u> within 1000 feet of public housing is guilty of a Class 2 felony.
>     c. Chapter 720 ILCS 570/<u>407</u> sets out multiple crimes with multiple elements, felony classifications and fine ranges and <u>is a divisible statute</u>. Therefore, 720 ILCS 570/<u>407(b)(3) was subject to review pursuant to the modified categorical approach</u>. *See Mathis*, 136 S. Ct. at 2256 ("If statutory alternatives carry different punishments, then . . . they must be elements."). *See* Attachment 1 (Statute) [(Text of Section 407(b)(3))].
>     d. A divisible statute allows review of limited case documentation. *Shepard v. United States*, 554 U.S. 26 (2005). <u>Pursuant to *Shepard*, Affiant reviewed the Bill of Indictment</u>. The Bill of Indictment stated that Mr. Elion knowingly and unlawfully delivered a look-alike substance to a confidential source within 1000 feet of public housing. <u>Affiant determined that delivery of a controlled substance fell under the definition of distribution or dispensing.</u>

(Doc. 13, Ex. A at 5-6) (emphasis added).

The Petitioner argues that these two sections of Kuenneke's affidavit, when read together, support the conclusion that Kuenneke performed a *Mathis* analysis on the wrong statute. According to the Petitioner, if Kuenneke thought there *may* have been a *Mathis* argument for the 2000 conviction, and both convictions were under the same underlying statute, it would be illogical for Kuenneke to write that there was a possible

35

*Mathis* argument for one conviction but not the other. The Petitioner suggests that the only explanation for Kuenneke thinking that analysis of Elion's 2000 conviction was unnecessary based on an analysis of his 1999 conviction, is that Kuenneke analyzed the wrong statute.

The Petitioner is incorrect.

First, aside from concluding that an underlying statute is divisible, there are other reasons why concluding that there is no *Mathis* argument for Elion's 1999 conviction does not *necessarily* preclude a *Mathis* argument for his 2000 conviction.

To determine that Elion's 1999 conviction was a valid predicate, Kuenneke had to compare his *Shepard* documents from 1999 to the Guideline definition. Elion's 2000 conviction could have been beyond the scope of the Guidelines while his 1999 conviction was not. The two convictions do not necessarily "rise or fall together," as the Petitioner asserts, (Doc. 84 at 12), they can easily be two different discrete offenses. While it may be an unlikely outcome, to be certain that there was no *Mathis* argument for his 2000 conviction after concluding there was no *Mathis* argument for his 1999 conviction, Kuenneke would need to perform a modified categorical approach analysis using Elion's *Shepard* documents from his 2000 conviction. She may have intuited that the conclusion would be the same for both convictions, but she could not know for certain unless she went through with the analysis.

Second, as Kuenneke explained in her testimony, both convictions were under the same statute. Having already done a *Mathis* analysis on Section 404(b), it would be redundant to perform that same analysis on the same statute:

36

Q. It says in the last sentence of this paragraph with Romanette ii, you say: "However, affiant determined that argument on the 2000 prior conviction was unnecessary as the 1999 and 2006 felony drug convictions were qualifying convictions for application of the career offender enhancement." Did I read that correctly?

A. Yes.

Q. So under this logic the 1999 conviction would have had to have been different than the 2000 conviction; right?

A. No.

Q. Well, you say here you determined that argument on the 2000 conviction was unnecessary because the 1999 and 2006 convictions were themselves qualifying convictions; right? Is that what that says?

A. Yes.

Q. When you looked at 2000, you thought there may have been a *Mathis* argument; right?

A. Yes, but my notes reflect that when I did the 404(b) analysis on the 1999 [conviction], that it was the same statute as the 2000 [conviction]. My notation is that they are the same statute, so it was the same analysis.

Q. I understand.

Evid. Hr'g. Tr., 59:19-60:17, Mar. 6, 2024 (Doc. 80). Regardless, even if Elion's 2000 conviction hypothetically was an invalid predicate for the career offender enhancement, Kuenneke had already determined that Elion had two prior drug convictions (one from 1999 and another from 2006). Thus, no matter the outcome of an analysis of his 2000 conviction, Elion had two valid predicates for the career offender enhancement.

In short, analyzing Elion's 2000 conviction after determining that Section 404(b) was divisible and that his 1999 conviction qualified, would be pointless; the outcome of that analysis would have had no impact on Elion's career offender status one way or the other. Kuenneke coming to that logical conclusion does not demonstrate that she analyzed the wrong statute.

### 4.  Kuenneke's Testimony was Truthful and Credible

Whether Kuenneke's allegedly erroneous analysis was the result of honest mistake, confusion, or lack of knowledge; the Petitioner believes that Kuenneke's misunderstood the law

by performing a *Mathis* analysis on Section 407(b)(3) and that any testimony she gave otherwise was dishonest. The Petitioner points to Subsection c of Kuenneke's affidavit:

> Chapter 720 ILCS 570/<u>407</u> sets out multiple crimes with multiple elements, felony classifications and fine ranges and <u>is a divisible statute</u>. Therefore, 720 ILCS 570/<u>407(b)(3) was subject to review pursuant to the modified categorical approach.</u> *See Mathis*, 136 S. Ct. at 2256 ("If statutory alternatives carry different punishments, then . . . they must be elements."). *See* Attachment 1 (Statute) [407(b)(3)].

(Doc. 13, Ex. A at 6) (emphasis added). Kuenneke attached Section 407 to her affidavit and referenced it in Subsection c. Additionally, in Subsection d of her affidavit, Kuenneke refers specifically to the offense of unlawful delivery to someone *within 1,000 feet of public housing—* again a reference to Section 407(b)(3), not Section 404(b). Section 407 is not divisible because it is a penalty statute, and penalty statutes are not reviewable under *Mathis*. If Kuenneke did attempt to perform a *Mathis* analysis on Section 407, that would certainly demonstrate a misunderstanding of the law.

When questioned, Kuenneke testified that Subsection c of her affidavit was written in error and that it was a mistake on her part. She claimed that her affidavit did not match her notes. She could not explain what caused the error. If Subsection c was truly written in error, then that error extended to attaching the enhancement statute to the affidavit and referencing it in the *Mathis* analysis.

The Petitioner was understandably incredulous. The Petitioner pointed out that Kuenneke reviewed and signed the affidavit, with the benefit of her notes, and with the case much fresher in her mind. Her "new story" has not only been provided "seven years after Elion was sentenced," the Petitioner argues, but she also "contradict[s] her prior, sworn representations." (Doc. 84 at 12). The Petitioner believes Kuenneke's testimony is "self-serving," and that disavowing Subsection c of her affidavit is an "attempt to preserve her professional reputation."

(Doc. 84 at 13). The Petitioner invoked the sham affidavit doctrine again and cited *Stewart v. Rise, Inc.*, 791 F.3d 849, 861 (8th Cir. 2015), which states that when a declarant's testimony *clearly* contradicts their past testimony and offers *no* explanation for the inconsistencies, then their new testimony should be disregarded.

Whereas in other places Kuenneke's testimony expands on and clarifies her affidavit, here, none can argue that her testimony directly contradicts her affidavit. Kuenneke claims this was an error in writing, not a misunderstanding; the Petitioner claims that is a lie, but regardless, the sham affidavit doctrine requires that the Court dismiss Kuenneke's testimony. The Petitioner is correct that, under the sham affidavit doctrine, when subsequent testimony clearly conflicts with a previous affidavit without explanation, courts disregard the subsequent testimony. However, Kuenneke did provide an explanation: she made an error; if that explanation is true, then the sham affidavit doctrine is inapplicable here. This is fundamentally an issue of credibility.

The Petitioner is justifiably skeptical of Kuenneke's explanation; indeed, the Court is skeptical as well, and all should be; a witness should not be allowed to cure contradictory testimony by merely claiming they made an unspecified "error," especially when that error is to their benefit, and when no explanation is provided. While any attempts to recant her affidavit should be viewed dubiously, other parts of her affidavit—even parts of the erroneous section of her affidavit and the citation to *Hinkle*—seem to corroborate her claim.

If it was Kuenneke's word alone versus her affidavit, the analysis would be more complicated. However, when a perceivable error in just a few sentences of a prior declaration would render a large portion of the declaration nonsensical, and then the witness later gives testimony that there was an error, and the correction makes the declaration internally consistent;

that seems to weigh heavily in favor of the conclusion that the declarant is telling the truth about their error, not attempting to "patch up" their earlier statements.

The Petitioner suggested on cross-examination that Kuenneke would rather lie to protect her reputation than admit to her mistake. Evid. Hr'g. Tr. 66:3-67:10, Mar. 6, 2024 (Doc. 80). Setting aside the decades Kuenneke has practiced before this Court that would suggest she would not perjure herself—especially not to keep one of her former clients in prison—as an experienced defense attorney, Kuenneke knows better than most that contradicting her affidavit would draw exacting scrutiny from both opposing counsel and the Court.

Yet, even presuming *arguendo* that Kuenneke is willing to lie to the Court, it begs the question why she chose to tell a lie that would subject her to such great scrutiny. As an experienced defense attorney who has a wealth of experience with habeas petitions for ineffective assistance of counsel, she knows the legal standard; she knows that she can provide testimony that would inoculate her against these claims—such as having some fictious "strategic reason" for not objecting—and it would be far more difficult to prove she was being dishonest. However, if she did lie, she chose to lie about performing research, analyses, and taking extensive notes—all claims that, not only subject her to greater scrutiny, but can be easily disproved if the Court reviewed her notes in camera, as she offered. There are many lies that would draw far less scrutiny and be far more advantageous; if Kuenneke chose to lie, she selected a lie that would be the least advantageous and draw the highest level of doubt. Perhaps a lay witness would tell a lie that would subject them to greater scrutiny, but it is difficult to believe that a defense attorney as seasoned and knowledgeable as Kuenneke—if she was determined to lie, with as much time to prepare for this hearing as she did—would tell a lie so easily disprovable, with the potential for such disastrous consequences. In short, the Petitioner's

argument would require the Court find that Kuenneke was not only incompetent and dishonest, but it would also require the Court find that Kuenneke would risk her career and reputation by perjuring herself with an easily disprovable lie, knowing she offered the Court her notes— evidence of her perjury. That seems very far-fetched.

In a similar vein, the Petitioner asked Kuenneke whether she was aware that the Seventh Circuit in this case had found that, in *Robertson*, the Eighth Circuit had misquoted the statute. Kuenneke testified that she was unaware of any part of the opinion in this case that indicated *Robertson* had misquoted the statute. As discussed before, the Petitioner was factually incorrect; however, Kuenneke had no reason to doubt the factual basis of the Petitioner's question. If Kuenneke had resolved to lie about her research and preparedness to preserve her professional reputation, it is odd that Kuenneke would confirm that she read the opinion, but not lie or at least imply anything about seeing a portion of the opinion addressing *Robertson*'s purported error.

Were the Court to find that Kuenneke's testimony is credible, there is the outstanding question of how such an error happened. There are several ways that such an error may have occurred that would not only explain the inconsistency, but also cure the remainder of the affidavit. A scrivener's error, though highly charitable, on the spectrum of possibilities seems far more likely than Kuenneke's woeful incompetence, ignorance, and fabricated testimony. While the Petitioner faults Kuenneke for not providing an explanation for the error at the hearing—it would be inappropriate for Kuenneke to speculate, under oath, on the cause or reason for an error that occurred over seven years ago.

In sum, though clearly contradictory testimony without explanation should be disregarded, Kuenneke did provide an explanation. While that explanation draws the Court's

41

scrutiny, all the evidence—including other aspects of the affidavit—when taken as a whole, point to the conclusion that Kuenneke's testimony was truthful.

### C.  **Summary of Factual Findings**

The Petitioner argues that Kuenneke misidentified the applicable statute, applied the categorical approach to the wrong statute, failed to notice potential mismatches, failed to perform a proper divisibility analysis, impermissibly relied on faulty, out-of-circuit case law, did not comprehend the basic tenets of *Mathis*, and then proceeded to risk her career and livelihood by not only perjuring herself, but offering up evidence of that perjury of her own volition for the Court's review.

The Court finds that Kuenneke identified Section 404(b) as the applicable statute, that she applied the categorical approach properly to that statute, that she noticed both potential mismatches, researched both mismatches, did not rely on one, faulty, out-of-circuit case to come to her conclusion, was familiar with the tenets of *Mathis*, properly performed the divisibility analysis, researched relevant issues as part of that analysis, and then applied the modified categorical approach. Furthermore, the Court finds that Subsection c of her affidavit was written in error and that Kuenneke's testimony was truthful and credible.

Now that the factual disputes have been resolved, the Court can evaluate Kuenneke's performance.

### V.   **INEFFECTIVE ASSISTANCE OF COUNSEL**

### A.  **Legal Standard**

The Sixth Amendment to the United States Constitution provides that defendants are entitled to effective assistance of counsel. U.S. CONST. amend. VI. *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970); *Watson v. Anglin*, 560 F.3d 687, 690 (7th Cir. 2009). Convicts may

move to have their sentence corrected, adjusted, or vacated by filing a habeas petition pursuant to 28 U.S.C. § 2255(a). The Court must grant a § 2255 petition when a petitioner's "sentence was imposed in violation of the Constitution or laws of the United States," 28 U.S.C. § 2255(a), including when a defendant received ineffective assistance of counsel at sentencing.

A party claiming ineffective assistance of counsel bears the burden of showing that: (1) counsel's performance—considering the totality of the circumstances—fell below objective, professional standards for reasonably effective representation ("deficiency prong"); and (2) but for that deficient performance, there is a reasonable probability—that is, a probability sufficient to undermine confidence in the outcome—that the proceeding would have been different ("prejudice prong"). *Strickland v. Washington*, 466 U.S. 668, 688-94 (1984); *Groves v. United States*, 755 F.3d 588, 591 (7th Cir. 2014). *Wyatt v. United States*, 574 F.3d 455, 458 (7th Cir. 2009). *Harrington v. Richter*, 562 U.S. 86, 104 (2011); *United States v. Jones*, 635 F.3d 909, 915 (7th Cir. 2011). If either prong is not satisfied, then counsel was not ineffective.

In the sentencing context, the court asks whether it was reasonably probable that defendant would have received a different sentence but for counsel's acts or omissions.

### 1. Deficiency Prong

To satisfy the deficiency prong, a defendant must show that—when measured against prevailing professional norms, considering all the circumstances and counsel's perspective at the time—their attorney "made errors so serious that counsel was not functioning as the counsel guaranteed [to them] by the Sixth Amendment." *Bridges*, 991 F.3d at 803. *Harris v. Cotton*, 365 F.3d 552, 555 (7th Cir. 2004). *Strickland v. Washington*, 466 U.S. at 689.

Generally, an attorney that conformed with "best practice[s] or the most common custom[s]" has provided objectively reasonable representation. *Harrington v. Richter*, 562 U.S.

86, 105 (2011). However, when the attorney becomes aware of "a *clear* avenue of relief for [their] client," *Bridges* at 806 (internal quotations omitted) (emphasis added), "following the crowd . . . is no excuse"; an attorney has a duty to research and pursue that objection regardless of norms, practices, customs, or whether other attorneys are making or pursuing that objection. *Jones v. Zatecky*, 917 F.3d 578, 580 (7th Cir. 2019)

When evaluating counsel's performance, "[j]udicial scrutiny . . . must be highly deferential." *Strickland* at 689. Accordingly, when an attorney makes a reasonable investigation and, through informed professional judgment,[7] concludes that raising a meritorious argument would not be in the best interests of their client; those decisions are "virtually unchallengeable." *Strickland* at 690. *Mosley v. Atchison*, 689 F.3d 838, 848 (7th Cir. 2012) ("[t]o avoid the inevitable temptation to evaluate a lawyer's performance through the distorting lens of hindsight, *Strickland* establishes a deferential presumption that strategic judgments made by defense counsel are reasonable."). Excluding "egregious" errors—i.e., "an omission of something obviously better (in light of *what was known at the time*) than the line of defense that counsel pursued," *Williams v. Lemmon*, 557 F.3d 534, 538 (7th Cir. 2009) (emphasis added)—when an attorney conducts an adequate investigation and comes to a reasonable determination that a challenge is meritless, that attorney is not deficient for refusing to raise the argument, *even if* that attorney's conclusion is later shown to be incorrect. *Id.* ("the question is *not* whether [a] lawyer's work was error-free, or the best possible approach, or even an average one but whether the defendant had the 'counsel' of which the [S]ixth [A]mendment speaks.") (emphasis added). *See Harris v. United States*, 13 F.4th 623, 630 (7th Cir. 2021) (finding that, even in situations where

---

[7] The term "reasonably informed professional judgment" here is used to describe a reasonable legal conclusion made by an attorney after conducting sufficient investigation into the issue or issues involved. *See Bridges v. United States*, 991 F.3d 793, 803 (7th Cir. 2021).

counsel's erroneous decision is not strategic, *Strickland* requires a court to conduct a "highly deferential" inquiry into the objective reasonableness of the representation).

However, while an attorney is not necessarily ineffective for making a mistake of law; an attorney's "mistake of law is deficient performance" when they forgo a meritorious challenge, despite "there [being] no conceivable strategic reason" to do so. *Cates v. U.S.*, 882 F.3d 731, 737 (7th Cir. 2018).[8] But again, the error must have been "*both* obvious *and* clear under *current* law," *Id.* (emphasis added), "so *obvious* and so prejudicial" in fact, "that a district judge should have intervened without being prompted by an objection." *United States v. Ramirez*, 783 F.3d 687, 695 (7th Cir. 2015) (emphasis added).

Forgoing a meritorious argument due to "*ignorance* [on] a point of law that is *fundamental* to [an attorney's] case[,] *combined* with . . . failure to perform *basic* research on that point [of law]," is a "quintessential example of unreasonable performance." *Hinton v. Alabama*, 571 U.S. 263, 274 (2014) (emphasis added). In cases "where the law is unsettled, a matter of first impression will generally preclude a finding of plain error," *Ramirez* at 695, especially when "the challenge would have required counsel to [ask] the court to break new legal ground," *Harris v. United States*, 13 F.4th 623, 630 (7th Cir. 2021) (quoting *Bridges*, 991 F.3d at 808) (internal quotations omitted), and raising said challenge would detract from arguments that were more likely to succeed in reducing a defendant's sentence. *Id.* at 631 (citing *Harris v. United States*, 366 F.3d 593, 596 (7th Cir. 2004)).

When an attorney has made a reasonable, informed, professional judgment that an objection lacks merit; despite being bound to act in their client's best interests—which includes

---

[8] This standard comports with the finding that an "egregious" error may be sufficient to find ineffective assistance of counsel. *See Williams v. Lemmon* 557 F.3d at 538.

making arguments that the attorney believes may be unsuccessful—that attorney has an ethical duty *not* to raise the meritless objection. That ethical duty extends to criminal defense attorneys:

> Criminal defense lawyers, like other lawyers, do not have an ethical duty to make groundless arguments; indeed, they have an ethical duty not to make such arguments. The refusal to act unethically by making a groundless argument can never be a ground for arguing ineffective assistance of counsel.

*United States v. Evans*, 92 F.3d 540, 544 (7th Cir. 1996). *Polk County v. Dodson*, 454 U.S. 312, 323 (1981) ("[A] defense attorney has a duty to advance all colorable claims and defenses, [but] the canons of professional ethics impose limits . . . . It is the obligation of any lawyer—whether privately retained or publicly appointed—not to clog the courts with frivolous motions."). *See Smith v. Robbins*, 528 U.S. 259, 272 (2000) (finding neither private nor appointed counsel have the right or duty to raise frivolous appeals).

## 2.  *Bridges v. United States*

The Seventh Circuit indicated that *Bridges v. United States* would be instructive here. In *Bridges*, the defendant was sentenced as a career offender based, in part, on a Hobbs Act robbery conviction. *See* 18 U.S.C. § 1951. The Seventh Circuit had not ruled on whether a Hobbs Act robbery conviction was a crime of violence for career offender status. Bridges's attorney did not object to the enhancement and, as a result, Bridges was sentenced as a career offender. Bridges filed a § 2255 petition arguing that Hobbs Act robbery was not a crime of violence, therefore, he was incorrectly sentence as a career offender and his attorney was ineffective for not raising the objection at sentencing. The district court found that Bridges's defense attorney was not ineffective because there was no binding precedent on the specific question of whether a Hobbs Act robbery was a crime of violence within the Seventh Circuit at the time of his sentencing; attorneys are not deficient for failing to predict changes in law.

Reversing and remanding,[9] the Court of Appeals found that Hobbs Act robbery was *not* a crime of violence and wrote that while they "had not so ruled when Bridges pleaded guilty":

> [T]he building blocks for a successful legal argument *were already in place*. Effective counsel would have considered this question that was so important in this case. At that time, *minimal research* would have uncovered a Tenth Circuit decision squarely holding that Hobbs Act robbery was no longer a crime of violence under a 2016 amendment to the guideline definition.

*Bridges v. United States*, 991 F.3d at 797–98 (emphasis added). While defense attorneys are not ineffective for merely failing to predict changes in the law, the defense that "[t]here was no binding [Seventh Circuit] precedent on this exact issue" is insufficient when:

> [C]ase law sufficiently *foreshadowed* this argument, which had been brought to the forefront by *both* a *recent* amendment to the Guidelines and *several* court of appeals decisions interpreting [that amendment].

*Id.* at 804 (emphasis added). "Reasonable counsel would investigate such a new and timely issue, known to benefit criminal defendants, especially considering the dramatic effect on the guideline range." *Id.* at 805.

An attorney who is unfamiliar or ignorant of the fundamental issues and laws involved in their case and fails to perform *basic* research—especially when a simple computer search would have yielded a plethora of persuasive authority, all cutting in the same direction—is a "quintessential example of unreasonable performance." *Id.* at 803-04. The depth of research required was minimal and given "modern methods of legal research, it would not have taken long," *Id.* at 805, to find case law squarely addressing the issue—case law that was *universally* favorable for Bridges: "*every* federal appellate court to address the issue squarely has concluded

---

[9] On remand, the Government and Bridges entered into a joint stipulation that his attorney provided ineffective assistance of counsel and the district court granted that motion without a written opinion on the merits. *Bridges v. United States*, No. 1:19-cv-00550-TWP-DLP, (Doc. 43) (S.D. Ind. Jun. 4, 2021).

that Hobbs Act robbery does not fall within the narrow definition of 'crime of violence' in [the Guidelines]." *Id.* at 800 (emphasis added).

While the fact that no attorneys within the Seventh Circuit were making this argument at the time "may carry some weight," courts do not "view [that] as conclusive." *Id.* at 806. Ultimately, "a lawyer's fail[ure] to take advantage of a *clear* avenue of relief for [their] client is no less concerning because many others made the same error." *Id.* at 806 (internal quotations omitted) (emphasis added). Setting aside research, when the career guideline "dramatically increased the advisory sentence," that issue deserved more attention, even in the absence of case law. *Id.* at 806 (citing *United States v. Winstead*, 890 F.3d 1082, 1090 (D.C. Cir. 2018)).

At the time of Bridges's sentencing, the categorical approach was "well-established"; understanding it and making Guideline arguments are "core competencies of federal defense counsel." *Id.* at 804. Even if Bridges's attorney was unfamiliar with the recent, significant changes in law; he could have reached the same conclusion, independently, had he performed a categorical approach analysis. "[T]he categorical approach is a well-known tool in applying the Guidelines, and as categorical approach cases go, [the] analysis [here] is *straightforward*." *Id.* at 803. (emphasis added). Had Bridges's attorney compared the statute with the Guidelines—i.e., had he even *started* a categorical approach analysis—he would have recognized that "Hobbs Act robbery is not a categorical match for generic robbery" after the Guideline amendments. *Id.* at 801. "[F]ailure to compare statutory definitions in resolving a guideline question during plea negotiations would, if proven, constitute deficient performance." *Id.* at 805. At a bare minimum "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 803. Ultimately, Bridges's attorney "should have been on the lookout for categorical approach problems given the recent [Guideline

amendment], the dramatic impact of this factor on [Bridges's] guideline range, and cases around the country where counsel did recognize and raise these arguments." *Id.* at 803.

While the Court of Appeals again emphasized that "[j]udicial scrutiny of counsel's performance must be highly deferential, as *Strickland* and its countless progeny have made clear," *Id.* at 807 (internal quotations omitted), "strategic choices made after *less than complete* investigation [of law and facts] are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 803 (emphasis added). An attorney cannot label their decision "strategic" to cure an incomplete investigation. *Id.*

### B. Legal Analysis

To establish that Kuenneke provided ineffective assistance of counsel, Elion must show that he was prejudiced by Kuenneke's refusal to object to the career offender enhancement and that her refusal to object to the enhancement fell below an objective standard of reasonableness.

The Court of Appeals has already found he was prejudiced, thus all that remains is analyzing the deficiency prong. If Kuenneke was deficient, then she provided Elion with ineffective assistance of counsel, and he is entitled to resentencing.

### 1. Kuenneke's Refusal to Raise the Categorical Approach Argument was not Strategic

Strategic decisions to not raise certain meritorious arguments are "virtually unchallengeable." *Strickland* at 690. Kuenneke had alternative arguments she chose to make, and she protested the fairness of the Guidelines. Evid. Hr'g. Tr., 36:18-37:4, Mar. 6, 2024 (Doc. 80). However, Kuenneke concluded that Elion had *no* categorical approach argument, not that he had a weak one. Kuenneke was asked about what she said to Elion and why she did not raise the objection:

49

Q. Okay. So you've completed this *Mathis* analysis and reached those conclusions. Did you convey those conclusions to Mr. Elion, at least the end result, that the career offender guideline looks like it applies?

A. Yes. I met with him and informed him I had researched the issue of the look-alike substance, and whether or not we could make an argument against career offender, and that I had concluded we could not.

Q. Okay. At sentencing or in advance of sentencing, did you raise any objections to the guideline calculations?

A. I did not.

Q. So having done all of that work, having pulled all of those records, why not raise it and give it a try?

A. I didn't believe it was a viable objection to present to the Court.

Evid. Hr'g. Tr., 33:8-23, Mar. 6, 2024 (Doc. 80). Kuenneke's refusal to raise the objection was not motivated by a strategic decision but rather an incorrect legal conclusion.

Having determined that Kuenneke's failure or refusal to object stemmed not from strategy but from an incorrect conclusion, the question is whether that erroneous conclusion is sufficient basis to find that Kuenneke was deficient by falling below an objective standard of reasonableness.

### 2.  Kuenneke's Representation was Not Below an Objective Standard of Reasonableness

Both in *Bridges* and here, there was no controlling Seventh Circuit precedent on their respective issues. Criminal defense attorneys cannot predict when there may be a change in law, however—as *Bridges* demonstrated—failure to predict a change in law is not always an excuse for failing to object. The key question is whether Kuenneke's performance is similar enough to the attorney in *Bridges* that the case controls, or whether Kuenneke's performance is sufficiently different that *Bridges* is distinguishable. Comparing Kuenneke's conduct here to the conduct of the attorney in *Bridges* yields multiple, significant differences that distinguish the two.

First, the attorney in *Bridges* confined his search to just the mandatory authority within the Seventh Circuit. The Appellate Court pointed out that artificially confining one's research to

mandatory Seventh Circuit authority does not give a complete picture of the legal landscape; what happens in other circuits may have predictive value or demonstrate trends. Kuenneke did not artificially confine herself; she researched state case law and federal law, both within and outside the Seventh Circuit. As a result, Kuenneke found *Robertson* and *Hinkle*, both key in her analysis.

Second, at the time of Bridges's sentencing, there was a plethora of case law outside of the Seventh Circuit—including from other appellate courts—all unanimously supporting a conclusion that Hobbs Act robbery was not a crime of violence. It would be one thing if the case law was split, but the case law all pointed in the same direction. Had Bridges's attorney looked outside the Seventh Circuit, he would be unable to ignore the building consensus that sufficiently foreshadowed his argument. Here, in contrast, there were only three relevant cases; two of those cases (*Hudson* and *Robertson*) addressed the "look-alike" mismatch and supported Kuenneke's conclusion that Illinois's look-alike statute included an intent to deceive element. Only one case (*Hinkle*) addressed the "delivery," "distribute" mismatch—but even then, *Hinkle* was distinguishable on multiple grounds. Not only did Kuenneke research outside the Seventh Circuit, there was a dearth of case law that addressed the issue. Additionally, unlike in *Bridges* where the building consensus cut against that attorney's conclusion, here, what sparse case law was available seemed only to support Kuenneke's conclusion.

Third, whereas in *Bridges*, the attorney neither found, nor read, nor analyzed any cases on the Hobbs Act robbery issue—a rudimentary requirement when determining whether to make a legal argument or not—this is sharply juxtaposed to Kuenneke's process. Kuenneke not only found relevant case law on issues that had hardly been addressed, she also read and analyzed each of those cases to determine whether they were applicable. Kuenneke read *Hudson* closely

enough to notice that the Seventh Circuit cited *Robertson*. Kuenneke observed that *Robertson* analyzed the same look-alike statute based on similar language. Kuenneke saw that *Hinkle* seemed to contradict her intuition and experience suggesting that "delivery" and "distribute" were interchangeable, but determined it was inapplicable. Her detailed reading and analysis of these cases certainly contrasts with the attorney in *Bridges*.

In short, unlike in *Bridges*, where the change in law was easily foreshadowed, there was *no* case law indicating that Section 404(b) was divisible or indivisible at the time, nor was there any case law on the "delivery" issue. This was an unsettled and nearly unexplored area of the law—the "building blocks" were nowhere near established at the time. There was certainly no "mountain of evidence" indicating that Section 404(b) was divisible—in fact, it was the *absence* of that evidence that led the Seventh Circuit to conclude divisibility was ambiguous.

Whereas Bridges's attorney failed to compare the text of the statutes to the Guideline definition, not only did Kuenneke correctly compare the text and the Guidelines, she also applied the categorical approach, recognized two possible mismatches, searched for relevant case law, analyzed that case law, found no dispositive answer in her research both inside and outside the Seventh Circuit, performed the divisibility analysis, and applied the modified categorical approach. Whereas merely comparing the statutes would have independently led Bridges's attorney to the conclusion that Hobbs Act robbery was not a valid predicate—meaning Bridges's attorney ignored a "clear avenue of relief,"—here, the question was far more complex and anything but "straightforward."

Turning away from *Bridges*, there are further indicators that Kuenneke was not deficient. For example, in *Hinkle*, the Fifth Circuit concluded that Texas's statute was indivisible by examining *Texas's* intermediate appellate case law. The Fifth Circuit found that *Texas's*

appellate courts had universally treated *Texas's* delivery statute as indivisible. As the divisibility analysis defers to state law interpretation, the Fifth Circuit merely adopted Texas's interpretation of a Texan statute. Elion was convicted under *Illinois*'s "delivery" statute, not Texas's, and, therefore, Kuenneke would know that Illinois state law controls. For that reason alone, the Fifth Circuit's ruling in *Hinkle* had little to no persuasive value. Kuenneke's ability to evaluate *Hinkle* further demonstrates her awareness and familiarity with the analysis, bolstering this Court's finding that Kuenneke knew how to properly perform a divisibility analysis—an analysis *explicitly* laid out for her in *Hinkle*.

The Petitioner has alleged that Kuenneke failed to find and rely on Illinois appellate case law indicating Section 404(b)'s divisibility. However, unlike in *Hinkle*—where the Fifth Circuit found that Texas appellate courts universally regarded the Texan "delivery" statute as indivisible—there were only passing references by Illinois appellate courts that hinted at Section 404(b)'s indivisibility. The Seventh Circuit declined to put any weight on those references in their analysis; Kuenneke was not deficient for doing the same. Additionally, Kuenneke's ability to evaluate state appellate law continues to demonstrate her awareness and familiarity with the analysis.

In sum, unlike in *Bridges*, where minimal, basic research would have revealed a clear avenue to relief; where a short and simple search would have returned a plethora of unanimous case law; where recent changes in the law should have alerted the attorney to legal changes; where the law was largely settled, the building blocks were already in place, and the argument was sufficiently foreshadowed by case law—Kuenneke engaged in extensive research and analysis, both within and beyond the Seventh Circuit. What sparse case law was available, Kuenneke found, analyzed, and used accordingly. The "building blocks" of Elion's argument

were *not* "already in place," this was an unsettled and largely unexplored area of law. There were

no recent legal developments—such as amendments to the Guidelines or recent controlling

precedent—that would have tipped Kuenneke off to a merited, let alone a "well-supported"

argument. Additionally, while the fact that no other attorneys at the time were raising the

argument is not dispositive, the fact that no other attorneys had raised this objection *does* have

*some* weight in the analysis, as the Seventh Circuit in *Bridges* stated, and it does not appear that

attorneys within this circuit were making this argument at the time.

Ultimately, an attorney's effectiveness is evaluated against objective standards of

reasonableness. Kuenneke's performance in Elion's case was far from deficient for all the

reasons elaborated on above. Contrary to what the Petitioner claims, Kuenneke's research and

analysis were not deficient, she simply came to a different conclusion that was later determined

to be incorrect.

### 3.   Kuenneke's Incorrect Conclusion is not Dispositive

The Seventh Circuit and Kuenneke proceeded through the analysis and came to similar

conclusions. The place of divergence was the final step of the divisibility analysis. Though the

Seventh Circuit and Kuenneke came to different conclusions on divisibility, the Seventh Circuit

was able to analyze Section 404(b) with the guidance of *Parzych v. Garland*, 2 F.4th 1013, 1019

(7th Cir. 2023), a case decided before Kuenneke's representation of Elion. Kuenneke did not

have the benefit of that guidance, and it was that guidance that seemingly tipped the Appellate

Court's analysis from leaning towards divisibility (as Kuenneke had found) to ambiguity. While

it is certainly possible that Kuenneke could have reached an independent conclusion that Section

404(b) was ambiguous without *Parzych*, without the benefit of that guidance, Kuenneke did not

have an unreasonable basis to conclude that Section 404(b) was divisible.

The Petitioner's brief makes much and more of the quote that "a mistake of law is deficient performance." (Doc. 84 at 10) (quoting *Cates v. U.S.*, 882 F.3d 731, 736 (7th Cir. 2018)). The Petitioner argues that an analysis of the deficiency prong is a straightforward evaluation of whether the defense attorney in question made a mistake of law. The Petitioner is incorrect; he either misstates or misunderstands the law.

An incorrect conclusion alone is insufficient to find that an attorney's representation was deficient. As the Seventh Circuit articulated in *Bridges*: "it is *not* enough to show that a challenge to the career offender enhancement should have prevailed." *Bridges* at 802 (emphasis added). Though *Bridges* and *Cates* (which the *Bridges* court cites) explicitly state that a mistake of law is deficient performance, the Petitioner has stripped those quotes of their context; read in context, not only are *Cates* and *Bridges* highly distinguishable, but it is clear that a "mistake of law" is far different from an incorrect legal conclusion—it is the kind of "egregious" error that has been long-recognized in deficiency inquiries. *See e.g., Williams v. Lemmon*, 557 F.3d at 538.

In *Cates* there was a clear error in a jury instruction that plainly contradicted both the text of the statute and well-established Seventh Circuit precedent:

> [T]he jury instruction flatly contradicted the text of [the statute] and our [prior] decision . . . . The instruction plainly misstated the law . . .
> . . . .
> The flaw in the instruction was both obvious and clear under current law. . . . Plain error requires obvious error that is clear under current law.

*Cates v. U.S.*, 882 F.3d at 737 (internal citations and quotations omitted). The Appellate Court in *Cates* was evaluating a situation of plain and blatant error. The *Cates* court uses the same language the *Lemmon* Court used in describing an egregious error. *Compare Cates*, 882 F.3d at 736 ("[when] [t]here is no conceivable strategic reason for a defense lawyer to forgo a challenge to a prejudicial jury instruction; a mistake of law is deficient performance"), *with Lemmon*, 557

55

F.3d at 538 ("[A] single error may suffice if that error is sufficiently egregious and prejudicial . . . . [A]n egregious error . . . [is] an omission of something obviously better (in light of what was known at the time) than the line of defense that counsel pursued.").

The specific language that a mistake in law amounts to deficient performance originates from *Hinton v. Alabama*, 571 U.S. at 274 (2014):

> An attorney's *ignorance* of a point of law that is *fundamental* to his case *combined* with his failure to perform *basic* research on that point is a quintessential example of unreasonable performance under *Strickland*.

*Id.* (emphasis added). The *Bridges* court quotes *Hinton* in other parts of the opinion that articulate the well-established standard that a mistake of law is not ipso facto deficient performance; rather it is a mistake of law that is egregious, a plain error, or an error that results from failing to understand a fundamental and basic part of their case.

In reviewing the "counterfeit" and "look-alike" mismatch, the Seventh Circuit declined to rule on the matter, finding the issue required careful consideration in the future. In reviewing the "advertising" issue and the subsequent "delivery" issue, the Seventh Circuit exhausted all available tools in the divisibility analysis, with the benefit of *Parzych*. Again, the Seventh Circuit concluded that Section 404(b)'s divisibility was ambiguous, and it was on that basis that Section 404(b) was deemed indivisible. The answer was far from clear, as both the length and thoroughness of the court opinions and briefs involved are testament to, this analysis was highly granular and reasonable legal minds can, and have, disagreed.

Kuenneke's refusal to object was not based on ignorance of the law—quite the opposite, it was based on her professional judgment—informed by a thorough analysis of the case law, her own extensive experience, and her independent and reasonable interpretation of the statute. She was well-aware of the law (or lack thereof), the categorical approach, and the divisibility

analysis. Contrary to what the Petitioner repeatedly suggests, Kuenneke did not have an ethical duty to make meritless or frivolous arguments, in fact, she had a duty *not* to.

Kuenneke researched the case law, term definitions, and analyzed that information considering her training and experience—that is far beyond "basic research." Kuenneke's process was a far cry from the attorney in *Bridges*. While Kuenneke was ultimately incorrect— her conclusion was based on a reasonable, alternative interpretation based on her professional judgment, informed by research and decades of experience. Her conclusion is not so outlandish that it would rise to the level of the plain, clear, or egregious error necessary to find that Kuenneke's mistaken conclusion rendered her deficient.

Had Kuenneke been completely ignorant of the law, had she been unaware of the categorical approach, had she not compared the statutes, had she not recognized a categorical approach problem, had she not researched the "look-alike" mismatch, had she not researched the "advertising" mismatch, had she not conducted a divisibility analysis, had the error been blatant and apparent; *then* perhaps her mistake may have risen to deficiency. But, when an attorney takes all appropriate precautions, performs extensive research, uses all the avenues at their disposal, and exhausts all available tools; and only *then* makes a reasonable, informed, professional judgment call—that is far from falling below an objective standard of reasonableness.

While the Petitioner focuses in on the fact that Kuenneke ultimately had a winning argument, an attorney is not deficient based on the results of their representation—if that were the case, *Strickland*'s deficiency prong would be entirely superfluous. Rather, whether an attorney is deficient depends on how they operated, with the knowledge they had at the time. If attorneys were deemed ineffective every time they came to a legal conclusion that was later ruled

57

to be incorrect, the Bar would be memberless, and the Bench would be vacant. Suffice it to say, Kuenneke's incorrect conclusion does not render her representation ineffective here.

## VI.    <u>CONCLUSION</u>

Kuenneke's testimony was honest and truthful. Her testimony is also supported by other parts of her affidavit. Kuenneke performed extensive research and analysis in an unsettled and unexplored area of law. She concluded based on her research, intuition, and decades of professional experience that Elion did not have a categorical approach argument. She was not obliged to raise an issue that she, in good faith and after a reasonable investigation, concluded was meritless. Though Kuenneke was later shown to be incorrect, that alone is insufficient to hold her deficient.

The cumulative evidence here demonstrates that Kuenneke's representation was not below an objective standard of reasonableness and, therefore—while her error prejudiced Elion—she did not provide Elion with ineffective assistance of counsel. Consequently, Elion's § 2255 petition is hereby **DENIED**.

**IT IS SO ORDERED.**
**DATED:  October 17, 2024**

*s/ J. Phil Gilbert*
**J. PHIL GILBERT**
**DISTRICT JUDGE**